The panel will now hear argument in docket number 1256, Southwest Bell v. Arthur A Collins. Mr. Summerfield, good morning to you. Please proceed. Thank you, Your Honor, and may it please the Court. This appeal involves a single issue. Before you go to your Bar Council, can I ask you, your entire brief is designated confidential, and usually confidential material is sort of drafted for us so we can write opinions that make sense and can be read, but I can't figure out what's confidential in here. A lot of that had to do with what was designated as confidential by Southwestern Bell in the proceeding below, Your Honor. We'd be happy to attempt, with Southwestern Bell's cooperation, to identify more particularly what the confidential information is shortly after this oral argument. What about the oral argument itself? Are there questions we shouldn't ask because the answer will necessarily reveal information that's been properly designated as confidential not only below but has to remain so here? Again, Your Honor, that's really not for Collins to say since all of the confidential information in this case belongs purportedly to Southwestern Bell. We don't really know, in fact, what's confidential. So then you don't object to our asking any questions, but Mr. Floyd might? That's correct, Your Honor. All right. Go ahead. So this appeal really does involve a single issue, and that's how bytes of data are written into and read out of memory positions in a digital cross-connect device. Isn't it just a question of proof? Was your proof sufficient to defeat the summary judgment motion of Bell? In part, that's right, Your Honor. The problem was the district court merged two independent arguments in reaching its decision. Well, I want to ask about the evidence. As far as I can tell, all your evidence to resist summary judgment was Dr. Glover's declaration, and particularly paragraph 11, just four or five sentences. Do you agree that that paragraph is the decisive evidentiary content as to whether summary judgment was appropriate or not? No, Your Honor. As a matter of fact, if we look at, for example, paragraphs 10 and 11, which the court can find at A1679 and 1680, we have a number of sentences in both of those paragraphs dealing with the two issues that I alluded to before and citations to documents provided by Southwestern Bell in the proceeding below. Do you agree that if your expert's declaration doesn't at least raise a substantial issue as to whether the information is put into memory randomly as required by the claim, that the opinion is affirmable? Of course, Your Honor. If Dr. Glover's opinion was insufficient to raise an issue of fact, then we lose. And that's what Judge Boyle held, is that it was too conclusory, too nonspecific, and didn't even really address the real issue, which had to do with memory placement, not reformatting prior to placement in memory. That's correct. That is certainly what Judge Boyle held. The problem, again, Your Honor, is that she merged a couple of different issues that Dr. Glover opined upon below. Dr. Glover said there were a couple of reasons why data ended up in nonsequential memory positions in the inlet memory of a DCS. How does he know? Because, among other things, he has decades of experience in this industry, and he also looked at documents provided by... All I can draw from what he said is it might be inefficient or illogical to do it in a non-infringing way, but that's quite different from saying that he has reason to know from reading the backup documentation that, in fact, it is done randomly. Actually, let me refer the Court to the specific paragraphs that we're talking about, because I think that will illustrate exactly what his reasoning was. And it was not simply, I think it would be inefficient. If we look at, and we can also look at at the same time, a diagram in Southwestern Bell's red brief, which is actually a page interposed between pages 38 and 39, which shows, among other things... Do their exhibits make your argument? That's an unusual circumstance. No, Your Honor, they don't. As a matter of fact, it helps illustrate what Dr. Glover is talking about. And as a matter of fact, we can just look at what Dr. Glover says. But that's not part of your evidence in opposition to summary judgment, is it? Then let's look entirely at paragraphs 10 and 11, Your Honor. That's perfectly fine. So in paragraph 10, Dr. Glover starts out by saying, the port modules, the Titan 5500, received optical signals, generically referred to as OCN signals, formed by interleaving or combining the successive bytes of lower-level STS electrical signals. Now, we know from the diagram that I had referred to that Southwestern Bell apparently doesn't contest that. Of course, in both your blue brief and the gray brief, you go on and on and on about the many points in which there's either flat-out agreement or at least no clear dispute. But what seems to be, if I understand this, what seems to be the critical issue, there's sharp dispute. You say you've proven it's random, meeting the claim limitation, and they say no such proof because he merely asserts it with no explanation or backup or citation to the manuals and other documents describing this device. Well, then he goes on, Your Honor, in paragraph 11 and says, in the first instance, every third byte of an OC3 signal is written into a memory position that is not in sequence with every second and fourth byte of that signal. And Judge Boyle said that was a naked conclusion with no factual support or documentary citation or other explanation. And it looks to me like maybe she's correct. Your Honor, if we look at one of the documents that Dr. Grover cites, and this is found at page A1695 of the appendix, actually 1694 and 1695, they show in the first instance a constituent STS-1 signal and all its constituent bytes of data. On the second page, the proprietary SDF format, which is the composite signal of data that's proprietary to the Tell Labs device. Both of these things show an entire channel of data reconstituted as it exists in memory. Now, if we look at what Dr. Grover was saying and we look at what Southwestern Bell was conceding, these bytes are not in this format when they arrive at the inlet port. Well, I don't understand what the connection is between the format and the placement in memory. It seems like they're distinctly different issues, and that seemed to be Judge Boyle's view. And as far as I can understand this technology up to now, they do seem separate and distinct. So by proving one, you don't necessarily prove the other. Well, that's what I was trying to say earlier, Your Honor. There were two issues that Judge Boyle confused. The first was remapping, which is what I think Your Honor is alluding to, the conversion of an STS to an SDF signal. That's where additional bytes of information are interspersed into the STS signal format to get to SDF. But why do we care about that? The holding on summary judgment was you didn't prove random memory placement. Only with regard to remapping, Your Honor. That's the problem with her decision. The second issue that Dr. Grover opined about is this interleaving issue, which has nothing to do with the conversion of an STS to an SDF frame. That has to do with what's shown on the southwestern bell drawing that says when these signals come in, they're interspersed. It's like a deck of cards that's been shuffled. And you unshuffle them as you read those cards, if you will, into memory. That's why the first byte is written to memory position one. The second byte is written into memory position four. How do we know that? That's the whole issue in the case. You're saying it. Grover says it. But how do we know it's true? And southwestern bell agrees with it, Your Honor. The only question they ask is, or they bring up, is where does it occur? If we look at the diagram that I referenced earlier in between pages 38 and 39, we see precisely what I'm saying depicted there by southwestern bell. It's because the district court used to randomly transmit to be writing of data into random positions of memory. So the fact that it is random at the inlet ports is irrelevant. It can be written into memory. We're not contending that they're random at the inlet ports, Your Honor. We're contending that they come in in the order shown on the left-hand side, 1, 2, 3, 4, 5, 6. This court— But that's not very random. That's the inlet port, Your Honor. If we look on the right-hand side, we see where the data ends up in the memory positions. This court said that random means non-sequential. And if we look at what southwestern bell acknowledges— Non-sequential is not 1, 2, 3, 5, 7, 10. It's random. I wrote it. Your Honor, 1, 4, 7, 10 is not sequential. Really? It sounds an awful lot like a sequence to me. Your Honor, random— It's a sequence of increasing numbers. Random— Maybe we should find the mirror.com and find out what the sequence is, because I don't think it means it has to be 2, 4, 6, 8. I'm pretty sure it has to just be an increasing list of numbers would be a sequence, wouldn't it? Your Honor, in that case, then there wouldn't be any— I mean, anything would be a sequence of numbers at some level. The question is, what does it mean to be non-sequential in the context of a random access memory? Pretty clearly, when we're talking about data transmission— This is your argument on claim construction. It's like a deja vu moment for me. I've heard it all before. No, Your Honor. Our argument on claim construction was data coming in from the add-drop multiplexer vis-a-vis how it arrives at the DCS. That was our argument there. Here, we took the term non-sequential to mean precisely what it means. It's not 1, 2, 3, 4, 5. Yes, Your Honor, it is true that we can take any sequence of numbers, and that would be a sequence no matter how random it looks on its face. However, when we're talking about a memory position, and we're talking about data transmission, random cannot mean random in lay terms. In other words, we throw this data anywhere and it ends up anywhere because then we wouldn't know where the data is. We wouldn't know how to switch it. We wouldn't know how to get it out the other side of the DCS, and we certainly wouldn't know. Can you give us a clear one-sentence definition of what you think, in this art and this patent, random means? Non-sequential. It does not go data position 1, data position 2, data position 3, data position 4, data position 5. That is a sequential ordering of data. So if you say 1, 2, 4, 5, 6, 7, 8, and you just skip a single number, now that's random according to you? 1, 2, 4, 5, 6, 7, all the way to a million. The only number missing was one number, the number 3. That's random? That would be a far-fetched definition of random. But, Your Honor, we don't even have to get to that here because what we have is not 1, 2, 3. But I'm trying to understand the rule that you said. We're trying to interpret a word, random. You're saying as long as it's not sequential, and your definition of sequential would seem to me 1, 2, 4, 5, all the way to a million would fall within your definition of sequential. Or non-sequential. Random and non-sequential. The Court interpreted those terms to be synonymous. Your Honor, I really don't have a position on whether that would be sequential or non-sequential. I do know, however, that in this case, which is the issue that's before the Court, where there are no two data bits being written into sequential, i.e., 1, 2, 3, 4, juxtaposed next to each other. How do we know 6, 8, 10, 12, 14, 16, 18, 20? Would that be random? Would that be random to you? 2, 4, 6, 8, 10, 12, 14, 16, 18, 20. Does it count random? That would be non-sequential, certainly, Your Honor. It would be random as this Court has defined the term. Random, again, cannot mean random in lay terms. It cannot be random like a lottery, because if that were true, data transmission wouldn't work. It would mean data could end up anywhere without any rhyme or reason, and that cannot be the way data transmission systems are designed to operate. But isn't your real problem the fact that there's nothing in the record that would establish how the SDF signal is written into the inlet memory? No, Your Honor. As a matter of fact... How do you object to that? How do you raise that issue? Among other things, Dr. Grover's opinion on paragraphs 10 and 11, page A1694... But aside from Dr. Grover's opinion, is there anything else in the record other than his affidavit? Page A1694 shows a constituted STS signal, which we know doesn't arrive at the inlet port. Southwest Bell agrees with that. Collins Expert has said it. There's no dispute. Southwestern Bell's diagram shows this. When we look at the orange bytes represented by numbers 1 and 4, 2 and 5, and 3 and 6, similarly colored bytes are part of the same reconstituted STS-1 signal. So we know, by Southwestern Bell's own admission, the information doesn't arrive at the inlet port, as shown in A1694. This is how these... But why do we care about arrival at the inlet port? I thought the issue was where it gets stored when it gets sent to memory. Right. Is it stored in sequential memory positions? And we know that byte number 1, as it arrives here, is written into position 1. Byte number 2 is in this position down here in a separate memory segment. Byte number 3 goes down here to this third memory segment, and so on and so forth. That's why we know that these are... Otherwise, Your Honor, we're evaluating the issue of non-sequentiality in a vacuum. The only alternative is to take a snapshot of how the data appears in memory after everything is done. And, of course, then it would be in sequence because all the positions are filled. The question, however, is... Is the chart that you were showing us attached to your response in opposition to Bell's summary judgment motion? This is actually in... This is their own chart, Your Honor. I understand it's their chart. You said that twice before. That's not my question. My question is, was it among the evidence appended to your expert's declaration so that it becomes your evidence in opposition to their summary judgment motion, the motion that was granted by the court below? No, Your Honor, but our position is that Dr. Grover says this in words. He doesn't need a diagram. He spells it out very clearly as to the fact that this happens. I agree with that. He says it happens. But why he says that is a mystery to me. Again, Your Honor, because... The sentence that counts, at least for me, is the third sentence in paragraph 11. It starts out with a phrase, in the first instance. I'm not even sure what that means. We're putting that aside. The rest of the language seems critical. Every third byte of an OC3 signal is written into a memory position that is not in sequence with every second and fourth byte of that signal period. I agree with you that that's an assertion having to do with sequentiality or non-sequentiality of memory site. But he doesn't explain where he gets that. I can't tell whether that's a guess or that that would be the logical or the beneficial way to do it. He doesn't cite anything in the manuals that are attached to his declaration. He doesn't quote anything. He makes an assertion. And if it's sufficient on its face, maybe you're entitled to prevail. But it's not blatantly clear that it's sufficient on its face. It certainly would have been much more helpful, at least to me, if he had said at the end of that sentence, as shown in line 437 of manual page 821. Actually, Your Honor, we have to look back at the first sentence of paragraph 10, which talks about where he gets the underlying supposition of this interleaving. And he says, The port modules of the Titan 5500 receive optical signals generically referred to as OCN signals formed by interleaving, combining the successive bytes of lower-level STS electrical signals, e.g. STS-1 signals. Why does that tell us anything about memory location as opposed to arrival state? Because that is the arrival state at the inlet port, Your Honor. I understand that, but how does that tell us that the memory placement has to be non-sequential? Because we know from the documents that Dr. Grover cites that the data has to be un-interleaved back into constituent STS-1 signals all together rather than interleaved. When it leaves? No, no, when it goes into the inlet memory, Your Honor. That's what's depicted in the southwestern bell diagram. That's what's explained by Dr. Grover. And that's what's shown in the documents that he refers to, including, among other things that we haven't looked at, A1700 and A1701 of the record, which talks about how OCN signals are constituted. Now you're saying that something in the manuals corroborates or documents his point? Yes, Your Honor. As a matter of fact... He doesn't cite it, but where specifically in the manual is the corroboration for his assertion? In paragraph 10, Dr. Grover cites to SWB 397135-37, which is reproduced here as pages A1700 and 1701 of the appendix. In paragraph 11, he cites to pages SWB 271108-11, which are reproduced at pages A1694 and 1695.  They're clearly cited in his declaration, Your Honor. And I'll reiterate, the judge never addressed this point in her opinion. Her entire opinion is devoted to the question of remapping. We don't reverse opinions because district judges said something inaccurate somewhere in the opinion. We only reverse the opinion in a case like this if we conclude that the evidence offered here, the declaration of Dr. Grover, was sufficient to defeat summary judgment because it raised a material fact issue that's genuinely posed by the evidence produced in opposition to the summary judgment motion. So either his affidavit cuts it or it doesn't. And that's what I'm trying to sort of understand by seeing where's the backup for the assertions in those few sentences of his affidavit. Then I will reiterate, Your Honor, the backup is as cited in paragraph 10, the first two pages I referred to, and in paragraph 11, the second two pages I referred to, the first two pages talk about how an OCN signal is comprised of smaller STS-1 signals, the interleaving that we referred to and that Southwestern Bell seems to acknowledge occurs. That's how the data arrives at the inlet port. The next two pages show how the signals as switched to the DCS are reconstituted for switching purposes, which means that there has to be an un-interleaving process to make sure that those signals are all once again together. And that is how the data gets written into the memory, by un-interleaving these signals, and that's what yields this non-sequential writing of data into memory. Dr. Grover explains that, he cites the documents, and that certainly satisfies this Court's and the Fifth Circuit's requirement for a declaration that is beyond conclusory. So are you saying that because we all agree that the signal is converted from, I forget now whether it's interleaved to un-interleaved or the other way around, but before it goes to memory, it's converted and that that by itself establishes that it has to be non-sequential. The conversion results in the... It can't result in anything else, just the nature of this kind of process. No, this kind of process, it's the nature of getting the STS-1 channels back to their entirely constituted self. It's like a dealer with a deck of cards. I have a deck of cards and I'm dealing a card to each of you. Each of you represents a different memory segment. I don't shuffle the cards, I take them out of the automatic shuffler and I deal them. And that's all I do. And if you all represent the memory positions, then at the end of the day, each card is in a non-sequential memory location because each of you has three successive cards. That's in contrast to what Southwestern Bell is arguing, which is I take five cards, hand them to Judge Garza, I take five more, hand them to you, Your Honor, and five more to Judge Moore. The problem with Southwestern Bell's argument is they have no evidence that that's what happens. But they don't have to prove anything because under Celotex, you have to successfully defeat their request for summary judgment by putting enough evidence on the scales to create a proper issue that a jury could decide and not be overturned on a Rule 50 post-verdict motion. You're right, Your Honor, and we believe we've done that in paragraphs 10 and 11 where Dr. Grover explains his reasoning, cites to record evidence now, even though that's not required under Rule 56, he certainly does, and the only thing  Southwestern Bell in all of this, which should be the bellwether of what this court is really going to decide, is where this un-interleaving takes place. They say, according to their drawing, that there's some interim step between the inlet port and the inlet memory by some undisclosed device that will throw the cards up in the air and reshuffle them before they're sent sequentially into the memory. There's no evidence of that, and I challenge Southwestern Bell to show any now. So the only thing we're left with is Dr. Grover's well-reasoned, supported testimony that what ends up happening is data is un-interleaved as it's sent to the inlet memory, resulting in these bits being written in non-sequential order, which is all that's required by this court's clarified definition of the randomly limitation. On the outlet side, the transmit side, Dr. Grover says that it's the mirror image. He cites the documents that say that. Well, if he's right on the first, you're right on the second, so it doesn't add anything to argue that separately, I don't think. Except the judge said that his reasoning wouldn't be sufficient even if he was right on the first because it was conclusory. Independently conclusory. We argue that, in fact, there's more than just his opinion. In any event, there are documents that show that. All right, let's hear from the other side. Thank you, Your Honor. Floyd. May it please the court. I would like to go to the blue brief on page 30. I hope, I shouldn't interrupt with such an irrelevancy, but I hope the panel and clients in this case will take some comfort at least from the fact that two of the three members of this panel, excluding myself, are highly qualified electrical engineers. Please proceed. I think this will help frame some of the issues. What's at issue is there's a yellow colored in TSI box. That's the inlet memory which must randomly receive data. That's what they have to show evidence of. There's also a TSI box at the bottom of that figure. That's the memory, the outlet memory, which must randomly transmit data. Then there's a port module in front of the inlet memory. The only thing important to note on that is that it's upstream of the inlet memory. It's in this port module that the un-interleaving and reformatting takes place. As far as Mr. Summerfield's representations that we've agreed somehow to their demonstrative by correcting it, a portion of it, we described their demonstrative at pages 7 of the red brief and then pages 38 to 40. He's holding and hanging his whole hat on page, paragraph 10 and 11 for the most part. Do you want to focus right in on those? Yes, Your Honor. That is the only evidence that they have. If you look at paragraph 10, what Dr. Rover says, and this was the point of our demonstrative in our brief, he says the port module, that's upstream of the inlet memory, receives signals and then he goes on to describe an example of an OC3 signal which is three STS1's interleaved together. This is the important part. The Titan 5500 separates these interleaved signals into separate STS1 signals. It un-interleaves them. Then, it remaps the STS into an SDF signal. What's important here is the order in which Dr. Rover says these operations must occur. In order to have an SDF signal, you must obviously first have the STS1 signal because that's what it's reformatted from. To get that, you must have un-interleaved the OC3 signal. Paragraph 11, the STF signals are passed to the inlet memories. So, he's saying this port module receives an OC3 signal. He's saying that this inlet memory receives the SDF signal. Well, in order for that to have happened, according to Dr. Rover, it first must be un-interleaved and reformatted. The only place that could have happened was the port module. And that was the point of our demonstrative showing that their early demonstrative in their blue brief was wrong according to their own expert. Not that we necessarily agree with everything their expert says, but even their own expert disagrees with what they're saying. The reordering of the data that they're pointing to occurs upstream, which is exactly the same argument they made on the first appeal. And this is further supported... Does their argument hinge on the notion, do you think their expert is accepting the 136 and saying that that is random? That numbers in increasing order are necessarily random? Does it hinge on this sort of claim construction type issue? It hinges on claim construction. What their expert is saying is actually broader than that. If you look on the left, that was the original exhibit that they offered for the first time on appeal. The left-hand side shows data entering at the port module upstream. It then shows the port module, that little black and white box. It doesn't show you what comes into the inlet memory, which is key. And then he represents that it's stored, and he doesn't have evidence to support it, but he represents that it's stored in this manner in the inlet memory. So what he's doing is he's comparing the order of data received upstream at the port module to the order in which it was recorded in the inlet memory. But how is their expert saying it's recorded? He says it's recorded in the order indicated on the far right that these are recorded in blocks. He has no support for that, but that's what he claims. Even if that were true, if that's the order in which they were received at the inlet memory, it's sequential. In other words, if all the orange blocks arrive first at the inlet memory and they get stored at the inlet memory, that's sequential, not random. But there's nothing in the record to support that. There's nothing in the record that goes to that level of memory. He admits there's nothing in the record. Their expert says no, it's recorded in this way, and that's in paragraph 11, the last sentence of paragraph 11. The SDF signals are stored separately in TSI memories in different memory segments. Then he cites two. But does that go to the issue of sequential or random? Couldn't quite figure that out. This goes to the order he's saying that they're stored in memory in separate locations. Now, that only supports his randomness theory if he could also show they didn't arrive in that order, which he doesn't show or even talk about. But even as to the order in which they're stored, that's what the district court found, and this document that Mr. Summerfield referred the court to, A, 1694 and 1695, that has nothing to do with how the data is stored, and, in fact, if you look to the description of these documents, on the previous page,     says is that the records are in the same location, and that the records are in the same location, and that says that the SDF signals are mapped from the STS1s, and it refers you to figures 3.4 and 3.5 to show you how that's done. So all this figure shows is in the STS1 format, data is stored or represented in this order, it's not necessary to tell you anything about what happens when it's received. So let me ask a broad question. Why isn't the experts affidavit in paragraphs 10 and 11 sufficient to raise a genuine speed of fact? The expert testimony has to be supported by some factual basis. You can't just opine. But he has to specifically point to what his basis is. So in the first Collins case against Nortel, they got poured out on the same basis. They lost in summary and they submitted an expert declaration where he points to manuals and pages and then he draws conclusions. And what the court held was that's not compliant with rule 56. Rule 56 requires, quote, to set forth the factual foundation for his opinion in sufficient detail for the court to determine whether that factual foundation would  a finding of infringement under the claim construction adopted by the court. It's not enough to simply point to some documents and expect the court to try to figure out on its own. It was his responsibility to point to specific documents and explain how  infringement. And he failed to do that because the documents, in fact, don't support. As I just showed you, his own declaration says all this occurs upstream of the inlet module. What's your response to Mr. Summerfield's assertion that because of what happens upstream, it necessarily is nonsequential as put into memory? That's complete nonsense. If it's reordered upstream and arrives at the inlet memory and gets stored in the same order in which it arrives, that's sequential writing. And that's what the court held on the first appeal. He's trying to reargue his old claim construction. Well, if it's randomized somewhere upstream, you compare that to the order in which it ultimately ends up in memory and that argument was rejected. So is your first line of defense of the favorable to you judgment below that this is race judicata? What he's really trying to do is reargue a decided claim construction argument that we, in effect, rejected on appeal by not disturbing the district court's claim construction? I do think that's what he did and that's what the district court held. The district court found this was just a rehashing of the prior claim construction and that's  did. In other words, even if we said it's not race judicata, it's not a rehash of the old argument, you would say I take it that you still win because he still has no specific factual foundation for the key assertions in the Glover declaration. That's absolutely correct, Your Honor. And lastly, I would just point out on the outlet memory that must randomly transmit, there's no evidence on that. He has two sentences and he says, well, it's a mirror image, therefore it randomly transmits. The fact that there's a time module up here in another memory down here, even if this randomly received, it doesn't logically follow that this must randomly transmit. And he makes no connections. He doesn't explain why logically that would follow. And as far as his expertise, relying upon his expertise, he's not an expert in the Titan 5500. But his qualifications to submit this declaration as I believe is not contested. We don't have a motion in limine issue before us. We just have summary judgments. At the lower court, had they tried to hold him out as an expert on the Titan 5500, we absolutely would have challenged it. So for them now to represent to you that somehow he has expertise on this particular device, that's not supported in the record. It's not in his CV. He never made that representation that somehow he's relying upon factual knowledge of how this device works. Thank you very much for your time. Thank you. Mr. Summerfield, we'll give you back two minutes of rebuttal, even though all of your time and seven minutes more were consumed. I apologize, Your Honor. I'd like to refer the court to page A13 of the record, which is the district court's decision. At the very bottom of the page, the court says an OCN number of STS signals. While the Titan 5500 transmits OC1 signals as OC1 signals when passed on an optical fiber, other OCN or STSN signals are converted into an STF frame by mapping of their subpart STS1 signals. And at the very bottom of that paragraph, the judge says Dr. Grover's recitation of these general principles of the transformation of STS1 signals into the STF frames used by Titan 5500 is factually supported by the Titan 5500 manual. So Dr. Grover's opinions regarding how these constituted OCN signals are unconstituted in the constituent STS1 signals, the judge expressly found was supported by the manuals. So there's no dispute that what Dr. Grover is saying about these things coming in is interleaved signals. And then being uninterleaved when they're written into memory is supported by the manuals by the very findings of the district court. So we go... What about the next paragraph? She goes on to say that however... That's what I was trying to explain before, Your Honor. That's where the judge discusses remapping as opposed to uninterleaving, which was an alternative ground that Dr. Grover opined upon for randomization. And if we look at this paragraph, the next one, the one after that, all the way through page 17 of the record, which is the entirety of her evaluation of the infringement evidence, it all deals with remapping. It deals not at all with this, which is the uninterleaving operation that results in the data being written into every fourth memory position rather than into every fifth memory position. So that's what Dr. Grover understood the term not sequential when he rendered his opinions. There are no further questions. All right. We thank both counsel. The appeal is submitted. The hearing is adjourned.